# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARK SERAFINN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 03 C 9409 |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | Judge Virginia M. Kendall |
| TEAMSTERS, LOCAL UNION NO. 722; | ) | |
| STEVEN MONGAN, individually and in his | ) | |
| capacity as President of Local 722; and JOINT | ) | |
| COUNCIL 65 of the INTERNATIONAL | ) | |
| BROTHERHOOD OF TEAMSTERS, | ) | |
| INTERNATIONAL UNION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Serafinn ("Plaintiff" or "Serafinn") brings this action under §§ 101(a)(1), (2), (a)(5) and 609 of the Labor Management Reporting and Disclosure Act of 1959 (the "LMRDA"), 29 U.S.C. § 401 *et seq.*, against the International Brotherhood of Teamsters, Local Union No. 722 ("Local 722"); Steven Mongan, the President of Local 722 ("Mongan"); and Joint Council 65 of the International Brotherhood of Teamsters ("the Joint Council" or "JC 65") (collectively "Defendants"). Two members of Plaintiff's local union, Richard Williams and Lynwood Gowan, brought internal union disciplinary charges against Plaintiff. The charges alleged that Plaintiff violated union rules when he referred himself out to a project at a joint venture known as Newberg-Perini Stone & Webster ("Venture"), in place of other union members that were ahead of Plaintiff on the referral list. After a hearing, the panel reviewing the charges found that Plaintiff "brought reproach upon the Union in violation of his oath and obligations as an officer and member of Local 722 by scheming and implementing a scheme to take a job with the Venture to which other members had already been

properly referred." The panel ordered Plaintiff to compensate the other members for their lost wages and benefits and suspended him from the union for a period of six months. Plaintiff alleges that the charges were brought against him in retaliation for exercising his rights under the LMRDA. Plaintiff also alleges that his disciplinary hearing lacked the procedural safeguards guaranteed by the LMRDA. Plaintiff seeks a restoration of his union rights, injunctive relief to prevent future retaliation and compensatory and punitive damages. Defendants have counterclaimed for payment of the fines assessed against Plaintiff.

There is no genuine issue as to any material fact that Plaintiff received the procedural safeguards guaranteed under the LMRDA, therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's § 101(a)(1) and (a)(5) claims. Genuine issues of material fact exist as to whether the charges against Plaintiff were brought for the purpose of retaliating against his exercise of rights protected in the LMRDA. But because the evidence of retaliation implicates only Steven Mongan and Local Union 722, Plaintiff's §§ 101(a)(2) and 609 claims against JC 65 are dismissed. Plaintiff also has failed to identify any genuine issue of material fact that would preclude judgment as a matter of law on JC 65's counterclaim. Wherefore, JC 65's Motion for Summary Judgment is granted and Local 722's and Steven Mongan's Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion to Strike Portions of Plaintiff's Statements of Additional Facts and Declarations is granted in part and denied in part as reflected in this memorandum opinion and order.

## BACKGROUND

Mark Serafinn joined the International Brotherhood of Teamsters ("IBT") in 1977. Local Union No. 722 is a labor organization affiliated with the IBT. Local 722's offices are located in

LaSalle, Illinois. Joint Council 65 is the subordinate body of the IBT with which all IBT local unions in central and southern Illinois are affiliated. The delegates to JC 65 consist of the seven executive officers of each local union. Serafinn was elected President of IBT Local 722 in September 1992. Serafinn remained President until the end of 2001 when Steven Mongan defeated him in a close election. The six other members of Serafinn's slate – Michael R. Reilly, Richard A. Halfman, Bradley A. Miller, Betty Ann McInnes, George G. Harden and Ronald D. Ruberstall – won election that year. Serafinn challenged the results of the election without success.

The disciplinary charges brought against Serafinn involved his referral of himself to Venture. This referral allegedly violated union referral rules because other union members were ahead of him on the referral list and already had been referred to Venture. Richard Halfman, the elected Vice-President of Local 722, held the appointed position of Referral Officer for Local 722 from February 1995 until December 24, 2001. George Harden, a Local 722 trustee, and others assisted Halfman in making referrals. Harden was responsible for making referrals to Venture. Venture operates two nuclear power plants for Commonwealth Edison in Local 722's jurisdiction. On December 10, 2001, Venture sent Local 722 a request for a "recall for hire" of Edward Notschaele for an "outage" at the LaSalle County power plant, to report on December 17. On December 14, Venture sent an additional request for one "CDL qualified" Teamster, to report on December 26. And on December 17, Venture sent Local 722 a third request for two "CDL qualified" Teamsters, to report on January 2, 2002. On December 18, Harden sent a fax to Venture naming Patrick Mulligan and Al Gowan as the "2 Teamsters for Comm-Ed, Marsailles, IL." On December 21, Harden sent Venture another fax stating that Timothy Craig and Mary E. King should replace the names in the last fax. Patrick Mulligan, Al Gowan, Timothy Craig and Mary E. King all signed Local 722's referral book. The last

time Serafinn signed the referral book was on December 15, 1992, several weeks before he became President of Local 722.

Serafinn requested that Halfman refer him to Venture. Halfman refused. On December 24, Serafinn asked Halfman to come to the union hall. When Halfman arrived at the hall, Serafinn gave him a letter stating:

> As of December 24, 2001 you are no longer the Referral Officer of Local 722. Please return to me all materials relating to the referral system immediately.
>
> Fraternally,
> /s/
> Mark R. Serafinn, President
> Teamsters Local Union #722

At 12:49 p.m. on December 24, a fax was sent from Local 722 to Venture in Serafinn's handwriting stating as follows:

| PLEASE DELETE: | TIMOTHY CRAIG | ) | |
| | [address and soc. sec. #] | ) | TEAMSTER FOR |
| | | ) | COMM-ED |
| PLEASE ADD: | MARK R. SERAFINN | ) | MARSAILLES, IL |
| | [address and soc. sec. #] | ) | |

Serafinn's term as President of Local 722 expired on December 31, 2001. Serafinn showed up at the training site for Venture on the morning of January 2. Craig, Gowan and King did not show up on January 2.

Williams and Gowan filed charges against Plaintiff on January 17 and January 22, 2002, respectively. Each charge accused Serafinn of misusing his union office to refer himself out to Venture in front of other members on the referral list. On January 27, the Local Union 722 Executive Board held a special meeting. In addition to members of the Executive Board, William

Moore, a representative of the International Union was present. The minutes of that meeting state:

> Michael Reilly introduced two separate charges one from Mr. Lynwood Allan Gowan and James Richard Williams against Mark Serafinn.
>
> Motion by Ronald Ruberstell seconded by George Harden to send these charges to Joint Council #65 for a decision. Motion carried.
>
> Motion brought forth charges against Mr. Serafinn. Motion by Michael Reilly seconded by Betty Anne McInnes to send these charges to Joint Council #65 for a decision, due to a conflict of interest. Motion carried.

On January 28, Mongan filed separate charges against Serafinn for Serafinn's alleged interference with union affairs and intimidation of union members. On January 29, Michael Reilly, Secretary-Treasurer on Local 722, sent a letter to JC 65 stating that the Local 722 Executive Board unanimously had requested that the charges brought by Mongan, Williams and Gowan each be forwarded to JC 65 for disposition. Mongan sent a similar letter on February 6, adding that it was necessary to refer the case because a majority of the Local Union Executive Board – himself, Halfman, Harden and Reilly – were involved or would testify.

On February 8, JC 65 President Keith E. Gleason sent a letter to the parties stating that JC 65 had determined that in accordance with Article XIX, Section 1(a) of the International Constitution that the charges were by, against, or involving a majority of the members of the Local 722, and thus the Secretary-Treasurer must file the charges with the JC 65 Executive Board instead of the Local 722 Executive Board. In response, Serafinn wrote Gleason that Mongan and Reilly had misrepresented the Local Executive Board's proceedings and that, in fact, a majority of the Local Executive Board had told him that the charges were dismissed because they lacked merit, were filed improperly and were too vague and misleading to process. Gleason replied that if Serafinn's

allegations were true he should support them at his February 28 hearing, where he would have the opportunity to challenge the Joint Council's jurisdiction.

On February 19, JC 65 received a letter from Mongan amending his charges against Serafinn. Because the charges could not be served on Serafinn more than ten days before the February 28 hearing, as the IBT Constitution required, Gleason denied the proposed amendments. Three days before the hearing, Serafinn faxed a letter to Gleason again contesting the jurisdiction of JC 65 and arguing that the charges were not specific enough for him to prepare his defense. Gleason agreed that Mongan's charges lacked the required specificity and ordered them not to be heard at the February 28 hearing. Gleason, however, found that the claims filed by Gowan and Williams were specific enough – "[t]hey contain names, dates and places and, though written by lay people, spell out the general nature of the charged violation."

Serafinn's disciplinary hearing was held on February 28, 2002, before the JC 65 Executive Board in Springfield, Illinois. Local 722's representative recused himself from the matter, which was heard by representatives from the other local unions. The Chair of the hearing panel was Keith Gleason, President of JC 65. Serafinn, Halfman, Harden, Reilly, Mongan and Gowan each testified at the hearing. Mongan acted as the prosecutor of the claims and Serafinn defended himself. Gerry Miller acted as JC 65's legal advisor during the hearing. International Representative William Moore also attended the hearing.

Richard Halfman testified first at the hearing. In addition to the events regarding Serafinn's referral to Venture, Halfman testified about referral practices during his eight years as the primary referral agent for Local 722. Halfman testified that when he received a request for a union member, he sent out the member at the top of the referral list, unless another member had seniority with the

requesting corporation. Members were organized on the referral list by the date that they submitted their referral card; the earliest dates were at the top of the list. In order to submit a referral card, a union member must not have been actively employed. After a member was employed for five days, their name was removed from the referral list. On cross-examination, Halfman admitted that this referral practice varied on a few occasions during his tenure.

George Harden then testified that, as a referral officer assisting Halfman, he was responsible for communicating directly with Venture regarding their need for union members. Harden repeated Halfman's testimony regarding the events leading to Serafinn's referral to Venture. Harden also confirmed that he and Halfman used the referral process that Halfman described. On cross-examination, Harden acknowledged that Local 722 did not have a written referral policy.

Michael Reilly took the stand next. Mongan attempted to question Reilly regarding Serafinn's Venture referral, but Gleason cut off the testimony when it became evident that Reilly had no personal knowledge of the events. Mongan then asked Reilly about his letter to JC 65 in which Reilly represented that the Executive Board of Local 722 had voted to send the charges to JC 65. Reilly testified that "the total consensus of the board was to refer the charges down here because of the involvement of members of that particular board." Serafinn objected to this testimony as out of order and irrelevant to the charges against him. Gleason ruled the testimony admissible since Serafinn himself raised the jurisdiction issue in his letters to JC 65.

Mongan, being questioned by Gowan, explained Local 722's contract with Commonwealth Edison Power Generating Facilities (the "PHMMA Agreement"), the agreement governing work at Venture. In explaining the PHMMA Agreement, Mongan focused on the wages and benefits that Serafinn earned during his time training and work at Venture. Mongan admitted on cross-

examination that he learned of Serafinn's self-referral as early as January 4 but did not take any action to send additional or replacement Teamsters.

Lynwood Gowan testified briefly. Gowan denied that Halfman told him to show up at Venture on December 26 or January 2. Instead, Gowan testified that he gave Halfman his information after a general meeting on December 18 but Halfman said he would contact Gowan later regarding the date and location of the job. Gowen testified that he did not hear from Halfman again until Halfman called him on January 4 and instructed him to show up at Venture on January 7. After Gowan showed up on January 7, he never raised the referral issue with Serafinn during the several weeks that they worked together at Venture.

Serafinn testified regarding Local 722's referral process from his knowledge as its principal officer from 1993 to 2001. The panel allowed Serafinn to question himself. Serafinn explained three variances in the referral process: a job steward may be assigned out of sequence with any established or implied order of call, the union may send a particular member if deemed necessary to reclaim a market, and the union recognizes 36 months of seniority with a particular employer. Serafinn additionally testified that the referral list was not necessarily used for making referrals to certain jobs, like Venture, or for training. Serafinn stated that he took the referral book from Halfman and wrote the letter terminating Halfman as referral officer so that Mongan or others would not retaliate against Halfman for referring Serafinn to Venture. Serafinn acknowledged that it was his writing on the fax referring him to Venture but denied physically sending the fax himself. Serafinn also admitted that he needed the referral in order to show up for training, not that he did not know that he would be paid for the training. Regarding January 2, Serafinn testified that when Mary King and Timothy Craig did not show up for training, he called the union's headquarters and

reported their absences to George Harden.

The parties agreed that it was not necessary for Richard Williams to testify.

In closing argument, Mongan stressed that Serafinn had not signed a referral card and that a referral was necessary in order to receive training at Venture. Despite not being listed in the referral book, Serafinn asked Halfman to refer him to Venture. When Halfman refused, Serafinn terminated Halfman as Local 722's referral officer and then had a fax sent to Venture referring himself in place of another Teamster. Serafinn defended himself by explaining that he referred himself to Venture only for non-compensable training, for which the referral list was not used and that he intended to find other work after the training was complete – or, in his words, "[w]hat I am guilty of, and I will openly admit this, I am guilty of trying to get a major corporation to spend training money on myself so that I could be ingot trained and expand my marketability."

In a 27-page opinion issued on April 18, JC 65 found that "securing one of the best paying jobs in the Local Union for himself as well as employment preference for such jobs in the future was part and parcel of [Serafinn's] scheme." JC 65 rejected Serafinn's claim that his referral was for training only or that a referral was not needed to attend such training. The panel ordered Serafinn to pay Gowan $784.56 and King $9,082.50 in lost wages and benefits. When it was learned later that Craig should have been the union members referred to work at Venture, the compensatory award to King was shifted to his benefit. The panel also ordered Serafinn suspended from the union and from holding an union office, position or employment for six months.

JC 65's decision advised the parties that they could appeal as provided in Article XIX, Section 2 of the IBT Constitution. On May 30, Serafinn sent a letter to the General Executive Board ("GEB") in Washington, D.C., requesting a stay of the judgment and filing an appeal to the GEB

9

from the decision of JC 65.  Because Article XIX, Section 2(a) of the International Constitution provides that "all manner of appeals shall be taken" within fifteen calendar days from the date the decision is transmitted to the interested parties, the GEB rejected Plaintiff's appeal as untimely.

In July 2002, Serafinn attempted to pay his union dues.  Local 722 refused to accept his payment, taking the position that Serafinn may not be readmitted to the union until he has complied with the order issued by JC 65 – that is, until he provides restitution to Gowan and Craig.  Consistent with this position, Local 722 has refused to refer Serafinn to work and, specifically, denied his December 2002 request that he be assigned to the next outage at Venture.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite

specific concrete facts establishing the existence of the truth of the matter asserted."). An adequate

rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate.

*See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

## DISCUSSION

Lynwood Gowan and James Williams filed internal union charges against Plaintiff for

allegedly referring himself out to Venture in violation of union referral procedures. Finding that

Plaintiff "t[ook] a job with the Venture to which other members had already been properly referred,"

the JC 65 hearing panel fined Plaintiff and suspended him from the union. Plaintiff brought this

action challenging the fine and his suspension as violations of the LMRDA. Count I of Plaintiff's

Complaint alleges that Defendants unlawfully interfered with his right to vote on union matters in

violation of § 101(a)(1). Count II complains that Defendants retaliated against Plaintiff for

exercising his rights to speak and assemble freely with other union members and on union matters

in violation of § 101(a)(2). Count III complains that Defendants denied Plaintiff the safeguards

against improper discipline provided in § 101(a)(5). Count IV complains that Defendants violated

§ 609 by suspending Plaintiff from the union for exercising his rights protected under the LMRDA.

Boiling these counts down, Plaintiff's claims present two essential questions: (1) did he receive the

procedural safeguards afforded him under the LMRDA during his disciplinary hearing; and (2) were

charges brought against him in retaliation for the exercise of his rights protected by the LMRDA.

*See NLRB v. Allis-Chambers Mfg. Co.*, 388 U.S. 175, 194 (1967) (stating that the LMRDA seeks "to

protect union members in their relationship to the union by adopting measures to insure the provision

of democratic processes in the conduct of union affairs and procedural due process to members

subject to discipline").

## I.     Section 101(a)(5)'s Procedural Safeguards

Section 101(a)(5) safeguards union members against improper disciplinary action by providing that: "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. § 411(a)(5).  Plaintiff alleges that Defendants denied him these due process safeguards.  *See Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir. 1975) ("While the union member need not necessarily be provided with the full panoply of procedural safeguards found in criminal proceedings, the fundamental and traditional concepts of due process do apply to the union disciplinary hearings").  In addition to violating due process, Plaintiff contends that Defendants denied him equal rights and privileges within the union. *See* 29 U.S.C. § 411(a)(1).[1]  However, Plaintiff states no way in which Defendants discriminated against his rights protected in § 101(a)(1) other than expelling him from the union.  Thus, if Plaintiff properly were expelled from the union – that is, he received due process in his disciplinary hearing – he can have no claim for a denial of equal voting rights.  *See Calhoon v. Harvey*, 379 U.S. 134, 139 (1964) (stating that § 101(a)(1) "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote").  Because no genuine issue of material fact exists that Defendants afforded Plaintiff the due process rights guaranteed in §

---

[1] (a)(1) Equal rights
Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
29 U.S.C. § 411(a)(1)

101(a)(5), Defendants are entitled to judgment as a matter of law on Plaintiff's § 101(a)(1) and 101(a)(5) claims.

### A.    Written Specific Charges

A charging document satisfies § 101(a)(5)(A) if it contains "a detailed statement of the facts relating to the [incident] that formed the basis for the disciplinary action." *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 223, 245 (1971). The charges filed by Gowan and Williams contain specific dates of events, individuals with knowledge relevant to the matter and Plaintiff's actions that allegedly violated the union's by-laws and constitution. While the charges do not list any specific provision or rule that Plaintiff violated, Section 101(a)(5)(A) "does not require that these charges, to be valid, must be based on activity that the union had proscribed prior to the union member having engaged in such activity." *Hardeman*, 401 U.S. at 244; *see Frye v. United Steelworkers of America*, 767 F.2d 1216, 1223 (7th Cir. 1985) ("Reference to a specific provision of the union's constitution or by-laws is not required to meet the specificity requirement of section 101(a)(5)"). In fact, consistent with the policy of the LMRDA to allow unions to govern themselves with limited judicial review, this Court is not permitted "to scrutinize the union regulations to determine whether particular conduct is punishable at all." *Hardeman*, 401 U.S. at 245; *see, e.g., Kaufmann v. Local 461*, 124 F. Supp. 2d 1127, 1130 (N.D. Ill. 2000) (holding discipline proper as a matter of law even though rule against "side jobs" was unwritten). Along the same lines, it is not relevant whether the IBT Constitution provides that a specific provision must be listed. Even assuming a union fails to follow its own rules, it does not violate the LMRDA unless the violation of its internal rule also contravenes specific prohibitions in the LMRDA. *Hardeman*, 401 U.S. at 242-43, 91 S.Ct. at 615-16; *see Curtis v. International Alliance of Theatrical Stage*

13

*Employees Local No. 125*, 687 F.2d 1024, 1029 (7th Cir. 1982) ("The court's role is not to interpret

the rules, regulations, or constitution of the union but to determine if the person received a full and

fair hearing"). Thus, because the charges include "a detailed statement of the facts relating to the

[incident] that formed the basis for the disciplinary action" and Plaintiff has not demonstrated any

way in which the charges were misleading or prejudiced his ability to present a defense, the charges

satisfy § 101(a)(5)(A). *See Frye*, 767 F.2d at 1223 ("[A] disciplined member must demonstrate that

he was misled or otherwise prejudiced in the presentation of his defense").

### B.      Reasonable Time to Prepare Defense

Williams and Gowan filed their charges against Plaintiff on January 17 and January 22, 2002,

respectively. Plaintiff received notice of the charges against him on February 8, 2002. The hearing

on those charges occurred on February 28, 2002. Article XIX, Section 1(c) of the IBT Constitution

states that the accused shall be required to stand trial not less than ten days from the date the charges

are served upon him. While Plaintiff contends that his case was heard on an expedited basis, he cites

no evidence to support this contention. More important, Plaintiff does not identify any reason why

twenty days was not enough time to prepare his defense. The charges were not so complicated as

to require extensive investigation or preparation. Absent any identifiable prejudice, the twenty-day

period provided Plaintiff a reasonable time to prepare his defense. *See, e.g., Wellman v.

International Union of Operating Engineers*, 812 F.2d 1204, 1206 (9th Cir. 1987) (holding 28 days

notice reasonable).

### C.      Full and Fair Hearing

A full and fair hearing requires both an impartial tribunal and that the charges be supported

by "some evidence." *Tincher*, 520 F.2d at 854. Reviewing thoroughly all admissible evidence,

including the transcript from the disciplinary proceedings, no genuine issue of material fact exists that Plaintiff received a full and fair hearing on the charges against him.

### 1.    Impartial Tribunal

"An essential element of a full and fair hearing is an impartial tribunal which arrives at its decision on the basis of evidence which the accused has an opportunity to confront and rebut." *Tincher*, 520 F.2d at 854.  The declarations of Plaintiff, Harden and Halfman describe the hearing as "intimidating, biased and unfair."  Plaintiff argues particularly that the inclusion of Keith E. Gleason, the President of the JC 65, on the panel deciding the charges against Plaintiff rendered the proceeding unfair.  Plaintiff cites his history of antagonism with Gleason as well as Gleason's conduct during the disciplinary hearing itself.

Gleason admits that he and Plaintiff are political opponents.  In 1987, Serafinn joined the Teamsters for a Democratic Union ("TDU").  Serafinn was elected as a delegate to the IBT International Convention in 1991.  At the convention, Serafinn supported Ron Carey and Gleason support Hoffa, Jr.  Indeed, Serafinn may have been the only JC 65 delegate to support Carey and other JC 65 delegates campaigned against Carey and wore buttons saying "TDU sucks."  But "[w]hile a history of conflict and animosity between a member of a union and its governing body may set the stage for harsh or improper treatment of that member, charges that bias undermined the fairness of a disciplinary proceeding must be supported by specific factual allegations from which the operation of bias can be inferred."  *Frye*, 767 F.2d at 1225.

Beyond the general history of conflict between the members of Serafinn's faction and the members of Gleason's faction, Plaintiff's only specific evidence of bias comes from inadmissible hearsay – Gleason's statements that he would help Mongan "in any way he could" to get rid of

Serafinn, that Gleason told a former Serafinn supporter that he was welcome on the Board because he had switched sides and that in 1992 Gleason physically attacked two of Serafinn's officers from Local 722. *See Mandaglio v. United Brotherhood of Carpenters and Joiners of America (General Executive Board)*, 575 F. Supp. 646, 654 (E.D.N.Y. 1983) (denying claim where only evidence of bias came from hearsay). Because each piece of evidence is offered through a person without personal knowledge of the conversations or events, the evidence is hearsay and inadmissible. *See Martin v. Shawano-Gresham School Dist.*, 295 F.2d 701, 713 (7th Cir. 2002) (holding that unless a witness has personal knowledge statements are hearsay and cannot be used to defeat summary judgment). Absent specific facts, supported by admissible evidence, from which bias may be inferred, Plaintiff has not shown a genuine issue that he was denied a fair hearing by Gleason's inclusion on the tribunal.

Plaintiff also argues that Gleason's and other panel members' bias was evident during the hearing itself. Based on the transcript of the hearing and the affidavits of Plaintiff, Halfman and Harden, nothing in the record nor any of the alleged outside-the-record circumstances rise to the level of a due process violation. *See Frye*, 767 F.2d at 1224 (denying § 101(a)(5)(A) claim where "none of the claimed irregularities or the combination of all of them offend[ed] the traditional notions of due process"). From the beginning, Gleason exercised proper authority over the introduction of evidence and scope of testimony. Gleason reprimanded Mongan for asking leading questions of Halfman and for improperly trying to impeach his own witness. Likewise, Gleason sustained Serafinn's objection that Reilly could not testify to certain events because he had no firsthand knowledge of them. Gleason, over the advise of attorney Miller, even allowed Serafinn to ask and answer his own questions. Plaintiff's specific contention that members of JC 65 or the advising

16

attorney Miller were "coaching and leading" witnesses is not supported by the record. The portions of the transcript cited by Plaintiff show only JC 65 or its attorney advisor making points of procedure – such as how to properly introduce or lay the foundation for an exhibit. Further, none of the panel's questions of which Plaintiff complains were unfair or biased. The panel's questions sought answers to how exactly the referral process at Local 722 worked, a point relevant to whether Plaintiff improperly referred himself. Just because the questions and answers did not reflect well on Plaintiff does not mean that they were unfair and showed a bias by the panel.

Plaintiff next asserts that "witnesses were not allowed to testify among other things, that I did not violate any rules, or that a majority of our Local Union Executive Board decided to dismiss all charges against me because they lacked merit, and were motivated by political bias by defendants and the IBT." First, Plaintiff tried to elicit substantial testimony that he allegedly did not break any rules or the referral system by his conduct. The panel permitted him, without limitation, to question both Halfman and Harden at length about the referral process generally and the referrals to Venture specifically. Plaintiff also testified regarding his understanding of the referral process and why he did not violate it. Second, JC 65 did not deny Plaintiff the opportunity to testify or ask questions regarding the handling of his charges by the Local Union Executive Board and their referral of the charges to JC 65. When Plaintiff raised the "jurisdiction" issue at the beginning of his hearing, the panel instructed him that he would be allowed to question each witness on the issue as they were called to testify. When the witnesses took the stand, however, Plaintiff never asked them about what action the Local Union Executive Board took on the charges against him. In fact, Plaintiff actually objected when questions about the Local Board's vote on his charges arose. After Reilly testified that "I remember the total consensus of the board was to refer the charges down here because of the

involvement of members on that particular board," Plaintiff objected to the testimony as irrelevant to the charges against him and out of order. Thus, the record indicates that Plaintiff, not Defendants, prevented the witnesses from testifying as to whether a majority of our Local Union Executive Board voted to dismiss the charges.

Finally, nothing in the hearing transcript nor Halfman's or Harden's declarations show that Moore conferred with or intimidated witnesses. Their declarations state only that Halfman and Harden were "upset and nervous" by being sequestered with Moore and other JC 65 council members. In this regard, neither Halfman nor Harden declared that they testified untruthfully as a result of any of Defendants' actions. Accordingly, Plaintiff has failed to create a genuine issue of fact that Defendants' conduct during his disciplinary hearing demonstrated impartiality or deprived him of an opportunity to confront and rebut the evidence and witnesses offered against him.

      **2.**      **"Some Evidence"**

A full and fair disciplinary hearing "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made . . . [a] conviction on charges unsupported by any evidence is a denial of due process." *Hardeman*, 401 U.S. at 246. The "some evidence" standard applies even where a union member alleges that the charges were brought to suppress his free speech. *Id.* On this point, a slight, but legally significant distinction, exists between cases in which the disciplinary charges involve conduct protected under the LMRDA and cases, like the instant matter, in which the disciplinary charges are brought to suppress protected conduct. In the former cases, the protected activities are intertwined with, and inseparable from, the disciplinary charges. *See Sheet Metal Workers' Int'l Ass'n v. Lynn,* 488 U.S. 347, 354-55 (1989) (involving intra-union charge brought to punish member for engaging in protected speech activities);

18

*Schermerhorn v. Local 100, Transport Workers Union of America, AFL-CIO*, 91 F.3d 316, 324 (2d Cir. 1996) (addressing charges that intertwined allegations of disruptive conduct and protected speech); *Black*, 970 F.2d at 1463-65 (disciplinary charges related to violent and threatening behavior during picketing of union hall). In contrast, the conduct underlying the charges against Plaintiff – his alleged violation of union referral procedures – does not involve the exercise of a right protected in the LMRDA. Under this latter set of circumstances, a court independently evaluates the sufficiency of the evidence supporting the disciplinary charges from the alleged motivation for the bringing of the charges, each under the appropriate standard. If such a line of demarcation did not exist, a union member could abrogate a court's required deference to union affairs simply by alleging a retaliation claim in connection with his challenge to the underlying disciplinary action. *See Tincher*, 520 F.3d at 854 (recognizing the "general national policy against judicial interference in the internal affairs of unions"). Reviewing the record presented to JC 65, more than "some evidence" supports the panel's finding that Plaintiff referred himself out in place of another Teamster and in violation of the referral procedures.

Plaintiff does not dispute that he referred himself to Venture. But Plaintiff argues that because he referred himself out to training, not a job, it was not necessary that he follow union referral practices, including submitting a referral card. The JC 65 panel rejected Plaintiff's training versus job distinction and found Plaintiff guilty of scheming to take a job with Venture to which other members had already been referred.

More than "some evidence" supports the panel's determination that Plaintiff needed a referral for training and that he improperly referred himself out ahead of other Teamsters on the referral list. First, JC 65 found that Plaintiff knew that the training inevitably would lead to him receiving

preferential referral rights to projects at Venture for 36 months and, thus, "securing one of the best paying jobs in the Local Union for himself as well as employment preference for such jobs in the future was part and parcel of his scheme."  Second, Plaintiff's own actions and testimony demonstrate that he needed a referral for training at Venture.  Prior to December 24, 2001, Plaintiff asked Halfman to refer him to Venture.  After Halfman refused, Plaintiff replaced Halfman as the referral officer and handwrote a fax that deleted Timothy Craig and added Plaintiff's name as one of the union members referred to Venture.  If no referral were needed for training, as Plaintiff contends, he would have had no reason to replace Timothy Craig and refer himself.[2]  In the end, Plaintiff conceded as much during his testimony to the disciplinary panel:

Mr. McCabe: How did Venture allow you on the site without a referral from Local 722?

Mr. Serafinn: They allowed me out to the site for ingot training.

Mr. McCabe: Wait a minute.  I know for a fact that they will not allow you in for ingot training with a referral from - -

Mr. Serafinn: Right, and there were several people on the list.

Mr. Gleason: Who referred you for the ingot training?  They had to have a referral for you to receive the training.  Who provided them with a referral or your name so you could receive - -

Mr. Serafinn: Right, that was provided, correct.

Mr. Gleason: By who?

Mr. Serafinn: That was provided by me.

---

[2] Defendants submitted additional evidence regarding phone calls from Plaintiff's telephone number to Timothy Craig's telephone number on dates surrounding December 24. Because this information was not presented at Plaintiff's disciplinary hearing, it cannot constitute the "some evidence" needed to support the panel's decision.

Last, Harden and Halfman testified that referrals to projects such as Venture were made from the referral list unless a union member had seniority with the corporation – Edward Notschaele, for example, had seniority with Venture. Because Plaintiff had not signed a referral card since becoming President of the Local in 1992 and because other union members already had been referred, Halfman refused to refer him to Venture. The testimony of Harden, Halfman and Plaintiff himself provide "some evidence" that Plaintiff violated union rules in referring himself to Venture.

Because Plaintiff was served with written specific charges, given a reasonable time to prepare his defense and afforded a full and fair hearing, Defendants did not violate § 101(a)(5) in fining and suspending Plaintiff for his conduct. Consequently, Plaintiff's claim for denial of equal rights under § 101(a)(1) also must fail.

## II. Retaliation for Exercise of Protected Rights

Sections 101(a)(2) and 609 work in tandem to protect union members from being disciplined for expressing their opinions or views on union matters. *See Maddalone v. Local 17*, 152 F.3d 178, 183 (2d Cir. 1998) ("Section 101(a)(2) protects union members from direct interference with union membership rights in retaliation for their expression of opinions concerning union activities"). Section 101(a)(2) provides that:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings.

29 U.S.C. § 411(a)(2). While § 609 states that:

> It shall be unlawful for any labor organization, or any officer, agent,

> shop steward, or other representative of a labor organization, or any
> employee thereof to fine, suspend, expel, or otherwise discipline any
> of its members for exercising any right to which he is entitled under
> the provisions of this chapter. The provisions of section 412 of this
> title shall be applicable in the enforcement of this section.

29 U.S.C. § 529.  Finally, § 102, allows "[a]ny person whose rights secured by the [LMRDA] have

been infringed by any violation of this title may bring a civil action in a district court of the United

States for such relief (including injunctions) as may be appropriate."  29 U.S.C. § 412.

A union member may pursue a retaliation claim even if no due process rights were infringed.

*See Maddalone v. Local 17, United Broth. of Carpenters and Joiners of America*, 152 F.3d 178, 183

(2d Cir. 1998) ("The free speech and due process rights guaranteed by the LMRDA are distinct from

one another, and it is well established that a union member may bring a suit to redress a violation

of § 101(a)(2) free speech rights even if no due process violation is shown"), citing *Finnegan v. Leu*,

456 U.S. 431, 439 (1982); *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir.

1992) ("[T]he free speech and due process violations of the Act are separate and independent"),

citing *Sheet Metal Workers' International Ass'n v. Lynn*, 488 U.S. 347, 354-55 (1989).  Thus, even

if the evidence supports the charges against Plaintiff and Plaintiff received a full and fair hearing on

those charges before an impartial panel, a separate claim exists if the charges were meant to suppress

dissent or chill the exercise of rights established in the LMRDA.  To establish retaliation in violation

of §§ 101(a)(2) and 609, a plaintiff must demonstrate that: (1) his conduct was an exercise of free

speech as defined and protected by the LMRDA; (2) that defendants took actions against him in

substantial part[3] because of this exercise of his right under the LMRDA; and (3) that he suffered an

---

[3] Since the parties have not briefed the issue, Plaintiff's claim survives summary
judgment under either standard, and no clear authority exists as to whether a plaintiff must prove
that retaliation was "a" reason for the discipline or the "primary" reason for the discipline, the

injury as a proximate result of the actions of defendants. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir. 1992) (affirming use of jury instructions with these elements); *Kauffman v. Int'l Brotherhood of Electrical Workers, Local Union No. 461*, 124 F. Supp. 1127, 1131 (N.D. Ill. 2000) (adopting these elements).

Plaintiff has submitted facts from which a reasonable juror could infer that the charges against him were brought in order to suppress his opposition speech and conduct. Certainly, some evidence supports the conclusion that the charges were brought against Plaintiff simply because he violated the union's referral practice. However, other evidence suggests that the charges were brought against Plaintiff because he is a political opponent of Mongan and IBT General President Hoffa. *See Lamb v. Miller*, 660 F.2d 792, 794 (D.C. Cir. 1981) ("When there is some evidence that the reason for removal from office was permissible and some evidence that the reason was impermissible, the question whether protected activities were a cause for the removal must be resolved by a trier of fact"). Evidence of the latter cause revolves primarily around the role of Mongan and Moore in pursuing the charges against Plaintiff. Defendants admitted that Moore "gave procedural information to Gowan and Williams as to the manner to perfect their respective charges against Mark Serafinn and the Local Union Executive Board and then to the Joint Council." And the similar, often identical, language in the charges filed by Gowan and Williams raises a reasonable inference that the charges were not prepared independently. Additional issues of fact are raised by evidence that Moore took an active role in the charges being referred to JC 65 and attended the disciplinary hearing in Springfield. As to Mongan, he never sent any Teamsters to replace Plaintiff at Venture despite his knowledge of Plaintiff's actions. Additionally, the sworn declarations of

Court reserves judgment on the issue.

Harden, Halfman and Miller state that "a majority of our Local union executive board dismissed [the charges against Serafinn]," contradicting Mongan's representation to JC 65 that the Local Executive Board had voted unanimously to refer the charges to them. A genuine issue of fact thus exists as to whether Mongan and other officials at Local 722 caused the charges improperly to be referred to JC 65. Plaintiff, however, has provided no evidence that would create a genuine issue of material fact as to whether Gleason or JC 65 was involved in bringing the charges against Plaintiff. Accordingly, while the retaliation claims against Mongan and Local 722 survive summary judgment, the retaliation claims against JC 65 are dismissed.[4]

### III. Defendant Joint Council 65's Counterclaim

Defendant Joint Council 65's counterclaim seeks to enforce its April 18, 2002 award against Plaintiff under § 301 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 185, and Illinois law. Section 301 of the NLRA does not allow a federal court to enforce an award against an individual union member rendered pursuant to internal union procedures. *See Korzen v. Local Union 705, Intern. Broth. of Teamsters*, 75 F.3d 285, 288 (7th Cir. 1996) ("A suit on a contract between a labor organization and a member is not within the scope of section 301"). Illinois law, however, provides for suits to collect fines from members that violate union rules. In approving state court jurisdiction to enforce union fines, the Supreme Court explained:

---

[4] Because the evidence otherwise supports the discipline – a six-month suspension and fine – imposed on Plaintiff, even if he proves an improper motivation for the charges being brought, he is entitled to only nominal compensatory damages. *See Mandaglio v. United Brotherhood of Carpenters and Joiners of America (General Executive Board)*, 575 F. Supp. 646, 654 (E.D.N.Y. 1983). Plaintiff also would be entitled to punitive damages under the LMRDA if he can show that: "(1) in retaliating against the plaintiff, the union acted willfully or with reckless disregard for the plaintiff's interests; and (2) the conduct of the union was egregious or the harm it inflicted was severe." *Kinslow v. American Postal Workers Union, Chicago Local 222*, F.3d 269, 278-79 (7th Cir. 2000).

> Congress was operating within the context of the 'contract theory' of the union-member relationship which widely prevailed at the time. The efficacy of the contract is precisely its legal enforceability. A lawsuit is and has been the ordinary way by which performance of private money obligations is compelled.

*NLRB v. Allis-Chalmers, Manufacturing Co.*, 388 U.S. 175, 192 (1967); *see Local 165, Int'l Brotherhood of Electric Workers, AFL-CIO v. Bradley*, 149 N.E.2d 193, 201-202 (1st Dist. 1986) ("[T]he law is well-settled in Illinois that the constitution and bylaws of labor unions are contracts binding upon the union and its members. . . . there is no question but that a suit such as this, to collect union fines, can be filed in Illinois circuit courts"). If JC 65's counterclaim were brought as a separate action, this Court likely would lack jurisdiction. *See Int'l Union of Operating Engineers Local Union No. 17 v. Lexo*, 918 F. Supp. 69, 73 (W.D.N.Y. 1995) (holding that federal court lacked subject matter jurisdiction to enforce award against an individual union member rendered pursuant to internal union procedures). As a counterclaim in this action though, it falls comfortably within this Court's supplemental jurisdiction under 28 U.S.C. § 1367. *See Korzen*, 75 F.3d at 288.

As to the merits of JC 65's counterclaim, some evidence supports its decision to fine Plaintiff. In this regard, Plaintiff does not challenge the amount of each fine. Rather, Plaintiff disputes facts relating to whether Timothy Craig was deprived of any work as a result of Plaintiff's actions. The facts Plaintiff disputes are immaterial to the fine assessed against him. Plaintiff has not shown that he would have been next on the referral list had Craig been unavailable. Absent such evidence, Plaintiff took the position at Venture, and accompanying pay and benefits, from some Teamster regardless of whether it was Craig. Ultimately, because Plaintiff has not shown that the union violated the LMRDA or its own rules in entering the fine against him, the union is entitled to enforce its contractual right to payment of its fine. *See Local 165*, 149 N.E.2d at 201-202.

## CONCLUSION AND ORDER

Plaintiff's § 101(a)(1) and (a)(5) claims are dismissed as to all Defendants, while his §§ 101(a)(2) and 609 claims are dismissed as against JC 65. JC 65 is entitled to judgment as a matter of law on their counterclaim. Thus, Plaintiff's §§ 101(a)(2) and 609 claims for retaliation against Local 722 and Steven Mongan remain to be tried before a jury.

Wherefore, JC 65's Motion for Summary Judgment is granted; Local 722's and Steven Mongan's Motion for Summary Judgment is granted in part and denied in part; and Defendants' Motion to Strike Portions of Plaintiff's Statements of Additional Facts and Declarations is granted in part and denied in part.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: August 28, 2006